# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>v.<br><br>DENYS KOROTKIY,<br><br>   Defendant | Case No.  '22 MJ04198<br><br>COMPLAINT<br><br>33 U.S.C. § 1908(a)<br>33 C.F.R. § 151.25<br>Failure to Maintain an Accurate Oil Record Book (Felony)<br>18 U.S.C. § 2<br>Aiding and Abetting |

The undersigned complainant being duly sworn states:

On or about May 31, 2022, defendant DENYS KOROTKIY, within the navigable waters, internal waters, and ports of the United States in the Southern District of California, did knowingly fail to maintain an accurate Oil Record Book for the MV Donald, in that the defendant maintained and caused to be maintained an Oil Record Book that: (1) failed to record the transfers of oily bilge water from the bilge to the Sewage Tank; and (2) failed to record the discharges of oily bilge water from the Sewage Tank into the ocean; all in violation of Title 33, United States Code, Section 1908(a); Title 33, Code of Federal Regulations, Section 151.25; and Title 18, United States Code, Section 2.

//
//
//
//
//

The complainant states this complaint is based on the attached Statement of Facts, which is incorporated herein by reference.

_____
LUIS ARROYO, Special Agent
U.S. Coast Guard Investigative Service

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 in this 16th day of November, 2022.

_____
HON. DAVID D. LESHNER
U.S. MAGISTRATE JUDGE

Defendant DENYS KOROTKIY

## STATEMENT OF FACTS

1. I, U.S. Coast Guard Investigative Service Special Agent Luis Arroyo, declare under penalty of perjury, the following is true and correct to the best of my knowledge and belief:

2. I am a Special Agent with the United States Coast Guard Investigative Service (CGIS), assigned to the San Diego Resident Agent Office. This affidavit is made in support of a criminal complaint, charging defendant Denys KOROTKIY with Failure to Maintain an Accurate Oil Record Book, in violation of Title 33, United States Code, Section 1908(a), and Title 33, Code of Federal Regulations, Section 151.25, and aiding and abetting, in violation of Title 18, United States Code, Section 2.

3. The complainant states this complaint is based upon statements in the investigative reports of other Coast Guard personnel relating to an inspection of the Motor Vessel (MV) Donald after it arrived in the Port of San Diego on May 31, 2022, and further interviews of the crew members conducted in my presence on July 20, 2022.

4. The United States is part of an international regime that regulates discharges of oil from vessels at sea known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (known as "MARPOL"). MARPOL was enacted into United States law by the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1901, *et seq*. The regulations promulgated under APPS apply, in part, to all commercial vessels

over 400 gross tons while operating in United States waters, or while at a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States. 33 C.F.R. § 151.09(a)(5).

5. During the course of normal operation, large vessels routinely generate oil-contaminated bilge wastewater. This wastewater is generated when water in the bottom of the vessel (known as the bilge) mixes with oil that has leaked and dripped from the machinery and the lubrication and fuel system for the engines. MARPOL prohibits the discharge of such oily mixtures except where: (a) the oily mixture is processed through approved oil filtering equipment; and (b) the oil content of the effluent without dilution ultimately discharged into the sea does not exceed 15 parts per million (ppm). In practice, prior to discharge, oily mixtures are processed through a pollution control device known as the oily water separator (OWS) which separates water from oil. Processing is monitored by a device connected to the OWS known as an oil content meter (OCM). This device senses the amount of oil remaining in the effluent after processing by the OWS. If the OCM detects an oil content of greater than 15 ppm, as measured by the opacity of the effluent, then it sounds an alarm, shuts down the pumps, and/or diverts flow back to the bilges in order to prevent the discharge into the sea of oil in an amount greater than 15 ppm. The design of this system is regulated by MARPOL. Specifically, MARPOL Annex I, regulation 14 specifies that oil filtering equipment must be provided with arrangements to ensure that any discharge of oily mixtures is automatically stopped when oil content of the effluent exceeds 15 ppm. 33 C.F.R. § 151.10(a). In order to prevent discharges greater than 15 ppm, and in order to assure that the discharge

is accurately sampled and monitored, MARPOL and the regulations promulgated under APPS prohibit any dilution of the sample.

6.  MARPOL requires that oil discharges be documented in an Oil Record Book (ORB). Consistent with the requirements of MARPOL, APPS regulations require that ships other than oil tankers of more than 400 gross tons maintain an ORB. Entries must be made in the ORB whenever certain machinery space operations occur, including when there is a discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces and any other waste oil or sludge. 33 C.F.R. § 151.25. Each discharge must be fully recorded without delay in the ORB, so that all entries in the book are appropriate to the operation completed. Each completed operation shall be signed by the person or persons in charge of the operation, and each completed page signed by the Master or other person having charge of the ship. 33 C.F.R. § 151.25(h). The Master or other person having charge of a ship required to keep an ORB shall be responsible for the maintenance of such a record. 33 C.F.R. § 151.25(h).

7.  It is unlawful to act in violation of MARPOL, APPS, or implementing regulations. 33 U.S.C. § 1907(a). Any person who knowingly violates MARPOL, APPS, or implementing regulations commits a Class D felony. 33 U.S.C. § 1908(a). For the purpose of MARPOL Annex I, APPS and the regulations promulgated thereunder apply to foreign flag vessels while in the navigable waters of the United States. 33 U.S.C. § 1902.

8.  The U.S. Coast Guard (USCG), an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 522(a) to board vessels and

conduct inspections and investigations of potential violations of international and United States law, including MARPOL and APPS. In conducting inspections, commonly known as Port State Control (PSC) examinations, USCG personnel rely on the statements of the vessel's crew and documents, including information contained in the ORB. The USCG is specifically authorized to examine the vessel's ORB to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate operating procedures; whether it poses any danger to United States' ports and waters; and whether the vessel has discharged any oil or oily mixture in violation of MARPOL, APPS, or any applicable federal regulations. 33 C.F.R. §§ 151.23(a)(3) and (c).

9. The MV Donald was delivered into service in 2006, is a general cargo ship of 10,899 gross tons, and is approximately 482 feet in length. The vessel has a unique International Maritime Organization number of 9273791, and is engaged in international commercial maritime operations. According to the Continuous Synopsis Record, an internationally required document examined by the USCG, the vessel is owned by Donald Shipping Inc., a Marshall Islands-domiciled company, and operated by Interunity Management (Deutschland) GMBH, a German-domiciled company.

10. In advance of a routine scheduled USCG PSC examination of the MV Donald, the vessel's Second Engineer sent a report to the USCG claiming that the vessel's Chief Engineer, Denys KOROTKIY, had ordered the crew to pump oily bilge water directly from the vessel's bilge wells to the Sewage Tank for discharge into the sea, bypassing the required pollution prevention equipment. On May 31, 2022, inspectors boarded the MV Donald at the port of San Diego to conduct a routine PSC inspection.

11. As Chief Engineer, defendant KOROTKIY was in charge of the vessel's engine room, as well as a Second Engineer, Third Engineer, Electrician, Oiler and Fitter. As Chief Engineer, defendant KOROTKIY reported directly to the Master of the vessel, who had overall responsibility for the entire vessel. As Chief Engineer, defendant KOROTKIY was responsible for, among other things, shipboard control of machinery space waste, to include oily bilge water.

12. Following their inspection, USCG PSC inspectors informed me of the following pertinent facts regarding a violation of the APPS:

a. Several crew members interviewed during the inspection corroborated the Second Engineer's report;

b. The Second Engineer showed USCG inspectors a video that he recorded after making his report to the USCG. In this video, Chief Engineer Denys KOROTKIY is seen attempting to clean the Sewage Tank and checking it for oil with sorbent material.

c. USCG Pollution Responders took samples of oil observed in various tanks and piping onboard the vessel and sent them to the USCG Marine Safety Laboratory for analysis. The results of that analysis showed the presence of heavy fuel oil mixed with lubricating oil in the Sewage Tank; the contents of a Sewage Tank should only contain wastewater from human activities.

d. An analysis of three prior years of ORB records showed that previous chief engineers onboard the MV Donald accumulated approximately 65-85 gallons of oily bilge water per week in the engine room, while Chief Engineer Denys KOROTKIY did not accumulate any oily bilge water at all during his first 76 days onboard the vessel, and only began documenting

the accumulation of oily bilge water in the ORB around the time when the Second Engineer made his report to the USCG. The ORB did not record any transfers of oily bilge water to the Sewage Tank and did not record any discharges of oily bilge water or oil contaminated wastewater from the Sewage Tank into the ocean.

13. On July 20, 2022, the crew of the engine room were interviewed, with the assistance of an interpreter, and in the presence of counsel provided by the company that operated the MV Donald. The Third Engineer stated that Chief Engineer KOROTKIY ordered him to use a pneumatic pump to pump the contents of the bilge well into the sewage tank, in the presence of three other crew members. The Third Engineer stated that he pumped the contents of the bilge well to the sewage tank approximately once a week during his shift. The Oiler stated that he heard Chief Engineer KOROTKIY order the Third Engineer to pump the oily bilge water into the sewage tank and observed a pump being used on two to three occasions to pump from the bilge to the sewage tank. The Oiler said he also once helped to pump the contents of the bilge into the sewage tank.